# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

ESTATE OF LEONARD P. KRAPPA, DECEASED, BY AND THROUGH HIS ADMINISTRATOR, LEONARD A. KRAPPA AND MARGARET KRAPPA, INDIVIDUALLY AND IN HER OWN RIGHT

v.

MARK LYONS, D.O.; FRANK PIRO, M.D.; JONATHAN C. SULLUM, M.D.; JUAN C. BARRERA, M.D.; JAMES FRANGOS, M.D.; LOUIS DEGENNARO, M.D.; AND COMMUNITY MEDICAL CENTER

PETITION OF: COMMUNITY MEDICAL CENTER

: No. 323 MAL 2019
:
: Petition for Allowance of Appeal
: from the Order of the Superior Court
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## CONCURRING STATEMENT

**JUSTICE WECHT**                                        **FILED: December 19, 2019**

I agree that the instant petition does not merit this Court's review. While this case suggests an issue of significant interest that may present itself in due course, it does not properly frame that issue for our consideration now. Nonetheless, the issue is worth mention, because it is likely to arise, recur, and materially affect many future disputes.

Less than two years ago, this Court issued its decision in *Reginelli v. Boggs*, 181 A.3d 293 (Pa. 2018).[1]  In that case, this Court decided several interpretive questions arising under the Peer Review Protection Act ("PRPA"), 63 P.S. §§ 425.1-425.4.[2]  The PRPA creates a limited evidentiary privilege for certain records pertaining to physicians' assessment of other physicians' performance, *i.e.*, "peer review."[3]  The instant case appears to be the first Superior Court opinion, published or otherwise, to apply *Reginelli*.

In this matter, the files as to which the parties dispute the PRPA's application were compiled by a "credentialing committee" in service of determining whether to "credential" and/or "recredential" two physicians subject to a medical malpractice suit.  *Estate of Krappa v. Lyons*, 211 A.3d 869, 871 (Pa. Super. 2019).  Respondent-Plaintiffs sought discovery of the committee's unredacted files concerning these physicians.  Petitioner-Defendant Community Medical Center asserted privilege claims as to many of the records, in furtherance of which it submitted privilege logs encompassing numerous documents, the vast majority of which it specifically denominated "peer review

---

[1]     I authored a dissenting opinion.  *See Reginelli*, 181 A.3d at 308 (Wecht, J., dissenting).

[2]     Act of July 20, 1974, P.L. 564, No. 193, *as amended*.

[3]     The PRPA defines "peer review" in relevant part as follows:

[T]he procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations.

63 P.S. § 425.2.

documents," and some of which were described in ways that suggested the denomination was apt. *See, e.g.*, Privilege Log of the Credentialing File of Frank A. Piro, M.D., at 2 ¶ 8 (describing a "Medical Staff Peer Recommendation" as a "[p]eer [r]eview document generated for . . . quality improvement purposes pursuant [to] MCARE. Not for redistribution outside [the] Committee."). Thus, Petitioner invoked the PRPA's protections. After reviewing the documents *in camera*, and considering arguments based upon the then hot-off-the-presses *Reginelli* decision, the trial court determined that none were protected by the privilege. On appeal, the Superior Court, which conducted its own *in camera* review, agreed. *Estate of Krappa*, 211 A.3d at 871, 875.

While *Reginelli* addressed a number of discrete questions of statutory interpretation, the aspect of the case relevant to this matter drew a categorical distinction between peer review and credentialing, as such. The Superior Court in this case relied heavily upon this distinction. It is not necessary here to delve into the lengthy statutory provisions at issue.[4] It suffices to say that this Court interpreted the relevant provisions to provide that "a review organization" is defined by the PRPA to encompass functionally distinct peer review committees and credentialing committees. Only the work and files of the former enjoy the PRPA privilege; files compiled for purposes of credentialing, as such, are subject to discovery. *See Reginelli*, 181 A.3d at 305-06. In doing so, this Court offered a relatively narrow definition of what comprises a "credentialing record."

The Court explained as follows:

> [A credentialing committee is] a "hospital board, committee or individual" involved in the review of "the professional qualifications or activities of its medical staff or applicants thereto" by a "hospital board, committee or

---

[4]     The relevant provisions are reproduced at length in *Reginelli* and in the Superior Court's opinion. *See Reginelli*, 181 A.3d at 301-02; *Estate of Krappa*, 211 A.3d at 873.

individual."[10]  [63 P.S. § 425.2.]  This . . . category of "review organizations" does not involve peer review, as that term is defined in the PRPA, which is limited to the evaluation of the "quality and efficiency of services ordered or performed" by a professional health care provider.  [*Id.*]  *Review of a physician's credentials for purposes of membership (or continued membership) on a hospital's medical staff is markedly different from reviewing the "quality and efficiency of service[s] ordered or performed" by a physician when treating patients.*  Accordingly, although "individuals reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto," [*id.*], are defined as a type of "review organization," such individuals are not "review committees" entitled to claim the PRPA's evidentiary privilege . . . .

_____

> [10] Professional "qualifications" would include, for instance, a physician's continuing maintenance of his or her board certifications, and "activities" could include clinical research initiatives, continuing education, service on professional committees or organizations and, more broadly speaking, other qualifications deemed necessary by the hospital.  Credentials review permits a hospital to retain, and then maintain, a medical staff of quality professionals.

*Reginelli*, 181 A.3d at 305-06 (footnotes 11 and 12 omitted; emphasis added).  I am concerned that the marked difference posited by the *Reginelli* Court will prove more difficult to discern in practice than it is to describe in the pages of a judicial opinion.

The PRPA embodies the legislature's effort to protect physicians who candidly reveal concerns about the quality of care rendered by their peers to committees that conduct such assessments, so as to ensure candid and reprisal-free physician assessments by those who are most qualified and best positioned to make them.  *See Reginelli*, 181 A.3d at 300 ("[The PRPA] was enacted to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public based upon the General Assembly's determination that because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities." (cleaned up)).  Thus,

the PRPA's immunity and confidentiality provisions reflect the legislature's effort "to foster free and frank discussion by review organizations." *Id.* (quoting *Sanderson v. Frank S. Bryan, M.D., Ltd.*, 522 A.2d 1138, 1140 (Pa. Super. 1987)); *see* 63 P.S. § 425.1, Historical and Statutory Notes ("An Act providing for the increased use of peer review groups by giving protection to individuals and data who report to any review group."). Such protection is not necessary with respect to essentially binary or anodyne inquiries, such as as whether a physician has maintained board certifications, pursued continuing education, conducted research, or otherwise attained certain qualifications—matters that the *Reginelli* Court identified as part and parcel of credentialing as commonly understood. Thus, to the extent these aspects of the credentialing and recredentialing processes can be isolated, *Reginelli* established that such credential-related documents and documentation of related activities are not privileged.

As is so often the case, however, practical considerations may confound our effort to draw clear distinctions in complex areas. This case anticipates a substantial difficulty that lurks in the shadows cast by our bright line.

Based upon the lower court opinions and the presentations of the parties, the "committee" in possession of the records that are at issue in this case may in the course of its work consider both peer review materials, as defined by the PRPA, and "credentials" in the elementary qualifying sense we described in *Reginelli*. Indeed, it is not entirely clear that Petitioner even has discrete peer review and credentialing committees, or that any other hospital does so rather than, for example, relying upon one committee to manage both processes. If and where this occurs, it may not suffice to reject the privilege

claim based solely upon the fact that the name of the committee contains the word "credentialing," or where peer evaluations play materially into the credentialing inquiry.

For example, if Petitioner's privilege log had accurately described certain records as consisting of peer review, properly understood, then the credentialing committee, as part and parcel of the credentialing process, accepted peer review from other physicians. This is hardly an unforeseeable result; there is no clear reason why a committee engaged in assessing a physician's fitness to affiliate, or continue to affiliate, with a given provider would not seek out peer assessments or consider prior or current peer reports concerning the quality of the physician's care.

Regardless of whether such records were sought from a committee named "peer review" or "credentialing," or whether they were utilized for purposes of assessing care in itself or for purposes of determining whether a given physician deserved to be credentialed or recredentialed at Community Medical Center, peer assessments are precisely what the General Assembly sought to protect from discovery in the PRPA to ensure that physicians freely and candidly assess each other's performances. Allowing disclosure simply because such documents were sought in connection with a credentialing process rather than as a targeted committee review of the quality of a physician's care for its own sake would invite the chilling effect that the General Assembly sought to prevent.

In this case, however, I see no evidence that the lower courts did not appreciate the distinction or that they allowed the committee label to drive their decision-making.[5]

---

[5] Notably, Petitioner acknowledged in open court both the distinction between credentialing and peer review files and that distinction's putative legal effect:

Indeed, from the bench, after reviewing the voluminous records *in camera*, the trial court signaled that it deemed certain documents to reflect peer review, and that its order would reflect that determination. Notes of Testimony, 4/10/2018, at 25-26 ("THE COURT: . . . There were a handful of documents I thought qualified for the privilege, but like I said, the vast majority I thought were discoverable. So now I'll have to go through and . . . parse them out."). That the court evidently changed its view on further reflection and ordered discovery of the entire credentialing committee file suggests nothing more than that it ultimately determined that no records qualified as peer review, not that the court failed to recognize a material distinction between credentialing and peer review materials. That the Superior Court affirmed the trial court after conducting its own *in camera* review only indicates that it found adequate support in the record for the trial court's conclusions, and I discern no basis for challenging that finding under the circumstances of this case. Nonetheless, nothing in the Superior Court's opinion signals any explicit recognition that the peer review/credentialing distinction must be drawn practically based upon case-specific considerations rather than mere nomenclature. Going forward, I think such recognition is important.

Courts should remain mindful of the potential for variability and overlap of different providers' peer review and credentialing processes, and should endeavor to balance the

---

[COUNSEL FOR PETITIONER:] I will concede that there are some things in the credentialing file, the Doctor's application that says where he went to school, whether he's licensed in whatever states, those kinds of things, [Plaintiffs have] all that. But when you ask another physician to critique a physician who is an applicant to your hospital, that's the very essence of peer review. That's one peer commenting on the ability of another peer. That's protected. And [*Reginelli*] does not say anything about that.

Notes of Testimony, 4/6/2018, at 11.

importance of providing access to evidence that qualifies for discovery under the usual permissive standard with the legislative mandate to protect peer review records from discovery. Only by doing so can courts ensure that the people best qualified to assess and police physician performance may do so forthrightly and without fear of reprisal. For its part, this Court should avail itself of any future opportunity to further hone the law in this challenging, consequential area of statutory interpretation.